Clais Daniels-Edwards, NJ Bar # 115122015
Assistant Federal Public Defender
Email: Clais_Daniels-Edwards@fd.org
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Attorney for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cr-00474-AB-1 |
| Plaintiff, | |
| v. | MOTION REGARDING JURY OR COURT TRIAL |
| CHRISTOPHER GRIFFIN, | |
| Defendant. | |

Christopher Griffin, by and through counsel, Clais Daniels-Edwards, moves this Court to empanel a jury to hear the above-mentioned matter. This case presents circumstances that warrant a trial by jury under the Sixth Amendment, and even if a jury is not constitutionally mandated, this Court should exercise its discretion and grant Mx. Griffin a jury trial in the interests of justice and fundamental fairness.

## I.   INTRODUCTION

Mx. Griffin is charged with three Class C misdemeanors: (1) Failing to Obey a Lawful Order, 41 C.F.R. § 102-74.385, (2) Obstructing Federal Property, 6 C.F.R. § 139.35, and (3) Trespassing on Federal Property, 6 C.F.R. § 139.35. These alleged violations occurred while

Page 1 Motion Regarding Jury or Court Trial

Mx. Griffin engaged in protest activity outside of the facility located at 4310 S. Macadam Avenue (hereinafter, the "ICE Facility"). Mx. Griffin, along with other protesters, expressed dissent for current immigration policies and enforcement, including dissent for the actions of the enforcement agents and government actors, within the ICE Facility.

There are compelling reasons for this Court to grant a trial by jury in this matter. First, the executive drafted this offense, and the executive has made clear that any violation related to protests at the ICE Facility are serious; the executive's characterization of the offense, notwithstanding the maximum statutory penalty, implicates Mx. Griffin's Sixth Amendment right to a trial by jury due to the severe consequences that would flow from a conviction. In the alternative, even if a jury trial is not constitutionally mandated, the executive has demonstrated arbitrary enforcement of the law and infringed on core constitutional principles in the context of protests at the ICE Facility. Pursuant to the district courts' broad discretion, this Court should grant a trial by a jury comprised of six members of the community.

## II.   BACKGROUND

The matters that Mx. Griffin is named in stem from his protest activity at the ICE Facility on three separate occasions, addressed respectively.

First, on October 22, 2025, Mx. Griffin, wearing an inflatable cat suit – part of a tactic to defuse the rhetoric of violence used to describe protestors – allegedly stepped onto the federal property line at the ICE Facility. Shortly thereafter, a targeted arrest began, in which Mx. Griffin was taken to the ground on their stomach and arrested. Mx. Griffin was left with scratches on their face, arms, and bruises from the arrest.

Second, on November 14, 2025, Mx. Griffin was detained again, this time for allegedly failing to move from the driveway after purported warnings to leave.

Finally, two days later, on November 16, 2025, Mx. Griffin was violently taken to the ground, from behind, by the "Bravo Team," a group of federal agents, after sitting on a low retaining wall on the west wall of the driveway. This was allegedly in response to Mx. Griffin, who Agents describe as a "known agitator," had "yelled obscenities" and "threw a beer can on federal property." Agents purportedly watched Mx. Griffin for over two hours before initiating a takedown. Mx. Griffin was taken to Legacy Emmanuel Medical Center after being detained, to evaluate them for head trauma.

In order to adequately consider Mx. Griffin's motion for a jury trial, it is necessary to provide the context in which the offenses allegedly occurred. Protest activity at the Portland ICE Facility became common in June 2025 and have remained fairly constant since – at times with only a few protesters outside the facility and others with hundreds of protesters present. On June 7, 2025, President Trump published a memorandum denouncing the demonstrations, declaring that "incidents of violence and disorder have recently occurred" at ICE facilities in several cities across the country.[1] According to President Trump, protests or violence that "directly inhibit the execution of the laws" are a "form of rebellion" against the United States, which led to the calling of units of state National Guards into service under the Posse Comitatus Act.[2] On June 14, 2025, around 50,000 people gathered in downtown Portland for a "No Kings" protest, largely

---

[1] Presidential Memorandum for the Sec'y of Def., the Att'y Gen. & the Sec'y of Homeland Sec., Department of Defense Security for the Protection of Department of Homeland Security Functions (June 7, 2025) [hereinafter June Presidential Memorandum], https://www.whitehouse.gov/presidential-actions/2025/06/department-of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.

[2] *Id.*

Page 3   Motion Regarding Jury or Court Trial

to show dissent of the Trump administration's immigration policies.[3] Later that day, protests around the ICE Facility escalated; protesters and federal agents clashed, ultimately leading to local police declaring a riot, although with the help of Portland Police Bureau, the situation stabilized.[4] An additional "No Kings" protest took place on October 18, 2025, where thousands of people gathered at the Pioneer Courthouse Square, followed by smaller protests at the ICE Facility.[5] On November 14, 2025, clashing protests took place at the ICE Facility, where proclaimed conservative streamers engaged in a "Patriots Weekend," to stand against perceived "doxing" by "ANTIFA" against "right wing content creators."[6] Since then, demonstrations at the ICE Facility have fluctuated, although tensions remain consistently high between protesters and federal officers.

Many of the important disputes around the nature of these protests, and what degree of federal response is appropriate, have made their way into District Court. In September, President

---

[3] OPB Staff, *'No Kings' Rallies Draw Thousands Across the Pacific Northwest*, OPB (June 16, 2025, at 10:13 PT), https://www.opb.org/article/2025/06/14/no-kings-protest-oregon-washington-liveblog/. Portland was one of many cities across the country hosting a "No Kings" event on June 14. *'No Kings' Protests Across the United States*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/14/us/protests-cities-no-kings.html.

[4] Michelle Wiley, Conrad Wilson & Troy Brynelson, *Police Declare Riot at Portland ICE Facility, Multiple Arrests Made*, OPB (June 15, 2025, at 09:00 PT), https://www.opb.org/article/2025/06/14/portland-police-ice-facility-riot/.

[5] OPB Staff, *A peaceful day of No Kings protests across Oregon ends with a show of force in Portland*, OPB (Oct. 19, 2025), opb.org/article/2025/10/19/a-peaceful-day-of-no-kings-protests-across-oregon-ends-with-a-show-of-force-in-portland/.

[6] Amy DeLaura, *"Patriot Weekend" and counter protests of inflatable animals at ICE facility in Portland*, Washington Examiner (Nov. 15, 2025), washingtonexaminer.com/news/38888345/patriot-weekend-counter-protests-inflatable-animals-ice-portland/.

Trump attempted to federalize the Oregon National Guard to address "The Radical Left's reign of terror in Portland."[7] However, Judge Karin Immergut issued a Temporary Restraining Order to block the deployment, finding in part that the President had exceeded his statutory and constitutional authority. *Oregon v. Trump*, 802 F. Supp. 3d 1277, 1292-95. More recently, Judge Michael Simon granted a Temporary Restraining Order for plaintiffs representing a putative class of Portland protesters seeking to exercise First Amendment rights. In the TRO, Judge Simon described the violent and extreme tactics undertaken by federal officers at the ICE Facility, and enjoined federal officers from using certain "chemical or projectile munitions" and from targeting individuals with less lethal munition weapons unless a specific target "poses an imminent threat of physical harm to a law enforcement officer or other person." *Dickinson v. Trump*, 2026 WL 279917, at *10 (D. Or. Feb. 3, 2026). Federal officers are also enjoined from firing any munition or using any weapons aimed "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against the person." *Id.* This litigation has helped illustrate the sometimes-excessive response by federal officers to protected First Amendment activity and revealed ways that core constitutional protections have been threatened and impeded.

### III.   LEGAL AUTHORITY

The right to a trial by jury is enshrined twice in the Constitution. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"); *id.* art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment,

---

[7] *President Trump Deploys Federal Resources to Crush Violent Radical Left Terrorism in Portland*, The White House (Sep. 30, 2025), http://whitehouse.gov/articles/2025/09/president-trump-deploys-federal-resources-to-crush-violent-radical-left-terrorism-in-portland/.

shall be by Jury."). Indeed, criminal trial by jury is a cornerstone of democracy, serving to "prevent oppression by the Government," and ensure community confidence in the justice system. *See Duncan v. Louisiana*, 391 U.S. 145, 155 (1968).

When incorporating to the states the Sixth Amendment right to criminal trial by jury, the Court recognized that this right is only implicated for "serious" offenses, and "petty crimes or offenses" are not subject to the jury trial provision of the Constitution. *Id.* at 159. Whether an offense is serious or petty depends on the "maximum penalty attached to the offense" as determined by the legislature. *United States v. Lewis*, 518 U.S. 322, 326 (1996). Absent "additional statutory penalties so severe as to indicate that the legislature considered the offense serious," an offense punishable by to up to six months imprisonment is presumed petty. *Id.* This presumption may be rebutted if an offense carries statutory penalties, in addition to the six-month maximum incarceration, "so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 543 (1989). Importantly, these rules establish when a jury trial is constitutionally *required* but are silent as to whether a jury may be granted when it is not required. *See Duncan*, 391 U.S. at 159.

Even when an offense is deemed "petty," such that a jury is not constitutionally mandated, courts retain the discretion to grant a trial by jury. First, it is axiomatic that federal district courts retain discretion, guided by statutory provisions, over docket, courtroom, and juror management. *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (discussing trials courts' "broad discretion" in considering continuances in criminal trials); *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220-21 (1946) (discussing trial courts' "sound discretion" in the context of voir dire); *United States v. W.R. Grace*, 526 F.3d 499, 509 (9th Cir. 2008) ("[A]ll federal courts are vested with

Page 6 Motion Regarding Jury or Court Trial

inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders." (citations omitted)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (explaining the "inherent power" retained by district courts). Petty offenses and other misdemeanor matters are governed by Federal Rule of Criminal Procedure Rule 58—this rule simply relieves magistrate judges of the requirement to inform defendants of their *right* to a jury trial, but in no way categorically prohibits jury trials for petty offenses. Fed. R. Crim. P. 58(b)(2)(F); *cf. United States v. Cruscial*, No. 3:18-cr-00465, 2019 WL 1087150, at *6 (D. Or. Mar. 7, 2019) ("Assuming, without deciding, that a magistrate judge possesses such discretion [to grant a jury trial]."); *see also* Fed. R. Crim. P. 23(a) (providing the court discretion to determine whether to allow a defendant to waive an otherwise-required jury trial).

Moreover, providing additional process under the Sixth Amendment is in line with recent Supreme Court jurisprudence. In *Ramos v. Louisiana*, the Court determined that all criminal juries must reach a unanimous verdict, overturning cases in both Oregon and Louisiana that held otherwise. 140 S. Ct. 1390, 1937 (2020). Additionally, in this Sixth Amendment decision, the Court acknowledged that "[u]nder existing precedent and consistent with a common law tradition *not at issue here*, a defendant *may* be tried for certain 'petty offenses' without a jury." *Id.* at 1394 n.7 (emphasis added) (citing *Cheff v. Schnackenberg*, 384 U.S. 373, 379 (1966)). This note provides two doctrinal insights: (1) the Court left open the possibility for a challenge to the traditional serious versus petty offense distinction; and (2) the Court expressly acknowledged that a defendant *may*—not *shall*—be tried for petty offenses without a jury. *Id.*

In deciding whether to use its discretionary powers and grant a jury trial in what otherwise would be a petty offense bench trial, it is crucial to refer to the principles underlying the distinction between serious and petty offenses and to the very purpose of jury trials. Courts

Page 7 Motion Regarding Jury or Court Trial

distinguish serious from petty offenses by focusing on the statutory maximum penalty attached to an offense because "[t]his criterion is considered the most relevant with which to assess the character of an offense" to enforce "the legislature's judgment about the offense's severity." *Lewis*, 518 U.S. at 326. Thus, the lawmaker's judgment regarding the nature of an offense is the most important consideration. Beyond maximum penalties, courts may consider additional collateral consequences associated with petty offense convictions that may demonstrate an offense is sufficiently "serious" to invoke constitutional protections. *See Bado v. United States*, 186 A.3d 1243, 1252 (D.C. Cir. 2018) (relying on *Blanton* to hold that when a misdemeanor conviction could result in deportation, trial by jury is constitutionally mandated); *see also Argersinger v. Hamlin*, 407 U.S. 25, 48 n.11 (1972) (Powell, J., concurring) (discussing the "wide range of civil disabilities" that may arise after a misdemeanor conviction in a case deciding when the right to counsel attaches).

Even more importantly, in determining whether to grant a jury trial, courts must contemplate the constitutional principles underlying the Sixth Amendment right to a trial by jury. As explained by the Court in *Duncan*:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection from arbitrary action. . . . Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence.

391 U.S. 155-56 (footnote omitted).

When executive actions raise substantial fears about arbitrary enforcement of criminal law, a court should feel empowered to exercise its discretion to allow a trial by jury, thereby reaffirming community confidence in our justice system. To be sure, under current precedent, the prosecution of these class C misdemeanors does not compel a trial by jury.[8] But critically, because there is no binding statutory or judicial authority expressly prohibiting a jury trial in this matter, this Court retains discretion to grant a trial by jury.

## IV.    ARGUMENT

This Court should grant Mx. Griffin's request for a trial by jury because the offense at issue is sufficiently "serious" to implicate the Sixth Amendment right to trial by an impartial jury. In the alternative, the court should use its discretion to grant a trial by jury in the spirit of the constitutional principles underlying the Sixth Amendment right to trial by jury.

### A.    The executive crafted the offense charged and the executive considers the offense serious, necessitating a trial by jury in this matter.

This Court should grant a trial by jury because the offense charged was drafted by the executive, rather than the legislature, so the classic "objective indications" of the seriousness of the offense are not apparent from the associated penalties. *See Lewis*, 518 U.S. at 326 (quoting *Frank v. United States*, 395 U.S. 147, 148 (1969)).

Mx. Griffin was cited on three instances for violating both 41 C.F.R. § 102-74.385 and 6 C.F.R. § 139.35. The offense giving rise to Mx. Griffin's liability was drafted by the executive branch, rather than the legislative. Although the legislature authorized statutory maximums for these regulatory offenses in 40 U.S.C. § 1315(c)(2), it ultimately delegated its authority to *define*

---

[8] Mx. Griffin reserves the argument that the Sixth Amendment should be reinterpreted to require trial by jury for some or all of what have traditionally been considered petty offenses.

the offenses to two executive agencies: the Department of Homeland Security and the General Services Administration. § 1315(c)(1). Therefore, although the legislature named maximum penalties, it did so vaguely, without defining the prohibited conduct itself. Otherwise stated, Congress did not define the offenses associated with the penalties and thus the typical deference afforded to the legislature in not warranted. Given the repeated emphasis on the *legislature's* judgment as to seriousness of offenses, here the convoluted connection between the offense and the penalty affords this Court broader latitude in determining whether a trial by jury is necessary. *See, e.g.*, *Blanton*, 489 U.S. at 542; *United States v. Nachtigal*, 501 U.S. 1, 3 (1993); *Lewis*, 518 U.S. at 326.

   Moreover, if it is true that the legislature fully entrusted the executive with its rulemaking powers in this instance, thereby allowing the executive to establish the seriousness of offenses, the executive has since made clear that regardless of the actual penalty associated with the offense, protesters at the ICE facility are serious criminals engaging in serious crimes. This is further reflected in the fact that the Department of Justice issued a press release on November 18, 2025, regarding Mx. Griffin's arrest and subsequent charge, which was then picked up by no less than four news outlets across Oregon. Based on the Department of Justice's own press release, the effect of which has labeled Mx. Griffin a potential criminal within the community, they deserve to be tried by members of their community to clear their name and must be afforded the greater procedural protection of a trial by jury.

   Further, on June 7, 2025, President Trump published a memorandum for the Secretary of Defense wherein he declared that Mx. Griffin's conduct constituted "a form of rebellion against

the authority of the Government of the United States."⁹ While Mx. Griffin maintains their innocence, the conduct Mx. Griffin is accused of falls squarely within the President's definition of a "rebellion." *Compare* 41 C.F.R. § 102-74.385 ("Persons . . . must comply . . . with the lawful direction of Federal police officers and other authorized individuals."), *with* June Presidential Memorandum ("To the extent that protests . . . directly inhibit the execution of the laws, they constitute a form of rebellion."). It is without doubt that should Mx. Griffin's alleged conduct constitute a "rebellion," it is serious.

Not only does the executive's categorization of the conduct render this violation serious, but the consequences beyond the statutory maximum are so great as to render the offense serious such that a jury trial is warranted. *See Blanton*, 489 U.S. at 542. To wit, a conviction arising from protest activity at the ICE facility in Portland may result in a designation as a domestic terrorist.[10] The President regularly broadly categorizes all Portland protesters as "Antifa militants" and even described the protests starting in June 2025 as a "siege to the ICE field office in south Portland."[11] According to an executive order and memorandum from the President, members of "Antifa" are domestic terrorists who will be investigated as such.[12] If this Court

---

[9] June Presidential Memorandum, *supra* note 2.

[10] Designating Antifa as a Domestic Terrorist Organization, 90 Fed. Reg. 46317 (Sep. 25, 2025).

[11] *E.g.*, *President Trump Deploys Federal Resources to Crush Violent Radical Left Terrorism in Portland*, The White House (Sep. 30, 2025), http://whitehouse.gov/articles/2025/09/president-trump-deploys-federal-resources-to-crush-violent-radical-left-terrorism-in-portland/.

[12] Designating Antifa as a Domestic Terrorist Organization, *supra* note 10; Nat'l Sec. Presidential Memorandum/NSPM-7 for the Sec'y of State, the Sec'y of the Treasury, the Att'y Gen. & the Sec'y of Homeland Sec., Countering Domestic Terrorism and Organized Political

takes the executive at its word, there are severe consequences associated with a conviction derived from protesting ICE that could have a significant impact, beyond the impact it has already had in light of press releases, on Mx. Griffin's privacy and liberty interests moving forward considering the potential future national security surveillance at stake. *See District of Columbia v. Clawans*, 300 U.S. 617, 627 (1937) ("[C]ommonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial, which the Constitution prescribes, in some cases which were triable without a jury when the Constitution was adopted.").

      **B.**      **Even if the offense charged is not "serious" such that Sixth Amendment mandates a jury trial, the Court should exercise its sound discretion and grant a jury trial.**

District courts retain broad discretion in managing matters not prohibited by Congress, particularly in docket and courtroom management. *See W.R. Grace*, 526 F.3d at 509. Further, while the Federal Rules of Criminal Procedure make clear under which conditions a trial by jury is required, the rules do not provide conditions under which a trial by jury is prohibited. *Contrast* Fed. R. Crim. P. 23(a) ("If the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves."), *with* Fed. R. Crim. P. 58(b)(2)(F) (requiring a magistrate judge to inform a defendant changed with a petty offense or misdemeanor charge of "the right to a jury trial before either a magistrate judge or a district judge--unless the charge is a petty offense"). The omission

---

Violence (Sep. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

of mandatory language in Rule 58 gives this Court discretion whether to grant a jury trial when it is not otherwise required. *See City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) ("It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." (cleaned up)). This Court should exercise its discretion to grant a jury trial because this matter implicates a core tenant of a trial by jury: government overreach.

Mx. Griffin acknowledges that the District Court of Oregon has declined to grant a jury trial to past defendants charged under the same offense. *See, e.g.*, *Cruscial*, 2019 WL 1087150 at *7; *United States v. Mumford*, 2017 WL 652449, *3-4 (D. Or. Feb 16, 2017). However, unlike defendants in *Crusicial*, Mx. Griffin is not simply indicating that "highly unusual or unique circumstances" or a "likelihood of local media attention" warrant a jury trial. *Crusicial*, 2019 WL 1087150 at *6; *but see United States v. Greenpeace, Inc.*, 314 F. Supp. 2d 1252, 1264 (S.D. Fla. 2004) (granting a jury trial for an otherwise petty offense because it was "unusual, and would benefit from a jury's collective decision-making"). Instead, Mx. Griffin urges the Court to recognize that this is a time when the voice of the community matters most. Particularly in the District of Oregon where only months ago, the court held that the President had "acted outside the scope of [his] constitutional authority conferred by Congress" when he federalized the Oregon National Guard to quell the very protests at issue in this case. *Oregon*, 803 F. Supp. 3d at 1295; *see also Newsom v. Trump*, 158 F.4th 984, 988 (9th Cir. 2025) ("For the first time in the nearly 250-year history of this country, the President claims extraordinary, unilateral powers to order state National Guard troops onto the streets of select cities in response to short-term, hyper-localized, domestic protests of federal policies."). There are indications that those charged with enforcing the law are threatening core Constitutional protections. As Judge Simon put it: "In

Page 13    Motion Regarding Jury or Court Trial

helping our nation find its constitutional compass, an impartial and independent judiciary operating under the rule of law has a responsibility that it may not shirk." *Dickinson*, 2026 WL 279917, at *1.

Mx. Griffin asks this Court to grant a jury trial to protect and affirm their core constitutional guarantees. While the District of Oregon has declined jury trials in matters arising under the same offense, the circumstances here are manifestly different and concern for government overreach is heightened. *See id.* at *4 (finding the actions of the executive to be "objectively chilling" First Amendment activity). If there were ever a moment to engage robust protections for citizens being prosecuted for offenses arising from potentially constitutionally protected activity, it is now. Further, if there were ever a moment to allow members of the community to weigh the credibility of government witnesses in executing the fact-finding function, it is now. *See* The Federalist No. 83, at 499 (Alexander Hamilton) (Clinton Rossiter, ed. 1961) ("The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government."); *see also Ramos*, 140 S. Ct. at 1395 ("[T]he promise of a jury trial surely meant *something*—otherwise, there would have been no reason to write it down.").

Because the executive drafted the charged offense and consistently treats violations of the offense as grave, this Court can find that the petty presumption is overcome such that a jury trial is required. In the alternative this Court should exercise its broad discretion in recognition of democratic and constitutional concerns to grant a trial by jury.

## V.   CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court exercise its discretion to allow a jury trial in this matter. The procedure for empaneling the jury should be the same as in a case alleging a misdemeanor carrying a penalty of six months or more of imprisonment.

Respectfully submitted on February 19, 2026.

<i>s/ Clais Daniels-Edwards</i><br>
Clais Daniels-Edwards, NJ Bar # 115122015